Docket 23-1603. Our next case is Sage Products, LLC v. Brent, Docket 23-1603. Counselor Franson, did I pronounce your name correctly? Yes, sir. Okay, and you have three minutes reserved for rebuttal, is that correct? Yes, sir. Okay, we're ready when you are. May it please the Court, Sandra Franson on behalf of the opponent, Stryker Sage Products. The Patent and Trial and Appeal Board committed legal error by repeatedly exceeding its authority in the two underlying IPRs, violating the APA. For each of the three grounds, the Board either disregarded or even outright rejected the petitioner's arguments, the grounds that were actually articulated in the petition, and found the claims unpatentable under their own grounds. As the Supreme Court has in the SAS case, it's the petition, not the director of the PTO, that governs the proceedings of an IPR. So the Board did legal error when it made up its own grounds. And let me start with ground one, the independent claims, because in that particular ground, the find-the-win decision actually rejected the petitioned argument, agreed with us, yet we still somehow lost that ground. So, and those errors in ground one permeate and are incorporated into all the other grounds. So in ground one, the petitioner's argument was relatively simple. Ground one was presented as a pure claim construction argument, where the petitioner lodged the independent claims were anticipated by the PAR, the UK Public Assessment Report, because the term sterilized, whether a sterilized product, article, or composition, simply meant being in a sterile condition. So they basically said PAR anticipates because the word sterile means that it's sterilized, and that's all that's required by the claims. The petition never argued that the PAR disclosed that any product, article, composition had been sterilized or was subjected to validated sterility processing. It was just not relevant to their ground one argument. Now, in response to that petitioned argument, Sage-Smith Page is arguing why sterilized and sterile were two different terms, and that they were not the same. In our argument, we argued that validated sterility processing was required consistently. Would a skilled artisan know that ethyl vinyl acetate is used to ensure that the contents of a package will remain sterile? Pardon me, I didn't hear the first part of your question. Sure. Would a skilled artisan know that ethyl vinyl acetate is used to ensure that the contents of a package remain sterile? I think that the record evidence did say that there was evidence in the record that that was something about ethyl vinyl acetate, but there was nothing in the PAR that said that the ethyl vinyl acetate had been terminally sterilized. And in ground one in particular, they never argued that it had to be sterilized. That was not their argument. And it was a claim construction argument, and Sage won that argument in the final ring decision. The board adopted— Because I understand what happened here. The petition said in the PAR, the word sterile would be understood by one of skill in the art to mean sterilized, consistent with the claim construction through a process, et cetera, et cetera. And you disputed that, and the board made a fact finding as to what one of skill in the art would read into the word sterile in the context of the UK PAR. Isn't that what happened? Your Honor, I disagree with that. In ground one, they presented it under their claim construction that sterile meant in a sterile condition and not subject to sterility processing. In ground two and three, they presented it under our claim construction. Once the board in the institution decision had an initial construction, the petitioners allowed to try to prove anticipation under the board's initial instituted construction. Are they not? Well, Your Honor, I think the way that was presented was that they proved obviousness based on—or they tried to prove obviousness based on PAR alone under the board's construction in ground two. Obviousness. They tried to prove anticipation under the board's construction in ground one. They did that after the fact. In their original petition, they presented ground one as a claim construction under their— Again, are you saying we have case law that says if the petitioner's proposed construction is not accepted, they per se lose on that ground? I'm not saying that that's a general rule. I'm just saying for this particular petition, how it was presented was anticipation under their construction in ground one and obviousness under our construction in ground two. And with regard to ground one, they never—the petitioner never argued and the petitioner never argued in the independent claims that the U.K. standards were relevant at all. It just was never brought up. They just said the word sterile means sterilized. And in ground two, they did argue that the U.K. standards, a person would understand and it would render obvious that it—under our construction. But that was their ground two argument, obviousness. They basically implicitly conceded that it was not anticipated under their construction, which was ground one. So in our view, we should have won ground one as we actually did in the institution decision. The board in the institution decision found in our favor that sterile didn't mean sterilized. It meant sterilized as we defined the term, not as BD did. But then what happened was that's not what happened in the final written decision. Instead, they—the board invented two new theories in the final written decision to find the independent claims anticipated. And the first new theory, which was never presented in the petition, was that POCES, by definition, would understand the term sterile to—they would know that the U.K.— they would know the U.K. regulatory standards for the U.K. Your main objection is the definition for the person on your skill in this case. That is a major objection because that definition, where they incorporated knowledge of red standards, the U.K. chloroprep product was subject to, permeated all the grounds. For example, you argue that a person of ordinary skill would not be aware of the U.K. regulations concerning sterilize and sterile, the difference in those terms. They would—I think that we more on—kind of more pointedly argued that they— the person of ordinary skill in the art did not know that the U.K. regulatory standards as they applied to the chloroprep product. And recall at the time, there was uncertainty in the area because antiseptics are sterile. They sterilize things. So you're saying, though, that a person of ordinary skill in the art would generally know about the U.K. standards? Are you admitting that? Yeah, you would know about standards generally, and I think people knew about standards, so that's not the issue. So typically the U.K. standards, right? Even the U.K. had standards that were similar to the FDA standards. It's just that there was no knowledge in the art and no POSA that actually knew that, for example, U.K. standards were used to sterilize chlorhexidine products, and the U.K. standards never mentioned sterilizing chlorhexidine products. That was something that was never shown anywhere. Just the two employees said that those standards apply. The board considered all of the evidence on these points and disagreed with you. They said, first of all, in you saying no person of skill in the art said these things, that's rejecting their expert, who the board specifically said would be a person of skill in the art and that you never moved to exclude them. So it just seems like all of this is substantial evidence questions, and I understand the procedural arguments, but putting them aside, seems like they're substantial evidence to support what the board found on all of these disputes you're raising. Well, I do think the clear legal error in the board going off the rails with its own theories, using a new person of ordinary skill standard, and they also made up this terminal sterilization theory standard with the ethylene oxide, which was just a completely new theory in ground one. I do think that was a clear legal error because it was not in the petition. A new standard for a person of ordinary skill. You're arguing that the board established a whole new standard for a person of ordinary skill or that the definition that the board ascribed to a person of ordinary skill in this case was there. Yes. Yes, your honor. The latter. The latter. So... I understood they adopted your proposed construction of a person of skill in the art. They did adopt our construction. However, when they actually applied the term, they required the person of ordinary skill in the art to have knowledge of the U.K. standards, specifically the 556 standard, as it applied to the chloroprep product. They made a finding that under your definition of person of skill in the art, having four years of experience, which was something your expert added to the definition, so not in dispute by you, that that person would know of these U.K. standards and would know how they differ from the U.S. standards. So finding a fact that they made about what a person of skill in the art, who you defined, would know. I don't see what's wrong with that. Well, the way that you're framing it, it does sound reasonable. But it's the specific point, not just did they know about U.K. standards like the U.K. has standards. It's how the standards apply to chloroprep in particular. Chloroprep, the medicinal product, the antiseptic, chlorhexidine products. There was their expert in- Didn't the inventor of the 6-3-2-10 actually admit to having heard of a sterilized CHE product available overseas? They did. There was testimony in the record that they had heard of it, but no one knew about the sterility processing. So it was kind of consistent with no one knew how to sterilize CHE. at the FDA hearings. And tellingly, Becton Dickinson was at the FDA hearings and didn't say, hey, we're manufacturing a sterilized product in Europe. No one knew about a sterilized product. At the time, everyone thought it was impossible. And kind of more importantly, how it applied to chloroprep in particular in the U.K. was not something even persons of ordinary skill in the art knew about. Their expert in particular had no experience of chloroprep prior to the case. He did not know about the standards at the time. And our expert, who was an expert on chlorhexidine, didn't know about it either. The only two people that were able to get up and say that the 5-5-6 standard supposedly applied to chloroprep were their two employees that had confidential information in their possession. So that was helpful. There was a lot of dead horses. Some people say that that's something that just happened. I thought that there was something actually in the decision making that sort of finding. Isn't that on, is it, appendix 41? I'm making the finding that way. I apologize, Your Honor. I'm making the finding that— I think we're— Appendix 41, the final written decision, takes the threat off the case that I was talking about in terms of knowledge about the sterilization of chloroprep in particular. I'm looking at page 41, Your Honor. How about this? At 42, we find it implausible that someone with four years of experience with sterilization processes for medical products and their components would lack familiarity with regulatory regimes that set the conditions under which those products work. Yes, and I starred that. Because, you know, I'm not an expert. And no one argued that that was a, to the definition— Is there not substantial evidence to support that finding after considering all the evidence on both sides? Your Honor, the finding of how it would apply to a U.K. chloroprep product, no, there's not. The only people that were able to say how it applied to the U.K. chloroprep product, and then, remember, we're talking about a prior art document, a PAR, not the product itself. This is a document, and how a person of ordinary skill in the art would view that. Their expert in particular had no prior experience with the U.K. chloroprep product. The first time he knew about it was the case. That's why, in reply, they brought in their two employees, and that was beyond the scope of what Ground One was to begin with. So those U.K. standards, which were never argued as relevant to Ground One in the independent claims, were imported and basically modified the PAR, which said nothing about the U.K. standard, which said nothing about sterilizing the product, and basically all this disclosure was being imported to beef up the PAR. Okay. You're into rebuttal time. Oh, okay. Does Cunningham have any questions? Okay. Okay, we'll restore your time. Thank you. Yes? Counsel, your last name is pronounced Wynne or Wynne? It could be either, depending on where you are, Your Honor, but in the U.S., I go by Wynne. Okay. Good morning, Your Honors, and may it please the Court. The Board correctly found the challenged claims of Stages Patents unpatentable based on three separate grounds. Now, this Court need only agree with the Board's conclusion on one ground to affirm, but here it can affirm on all three because substantial evidence supports the Board's findings that the U.K. Clerical PAR document discloses every element of the challenged claims, that the term sterile in a regulatory document such as the PAR would have had a specific meaning to a personal skill in the art, and in any event, a personal skill in the art would have been motivated to combine the PAR with the Degawa reference with a reasonable expectation of success. So what's your best argument to the argument that the other side is making, that a person of ordinary skill in the art would have been aware of the sterilization requirements under U.K. regulations? So, Your Honor, the Board looked to, and within my answer, I'd like to address a little bit of counsel's arguments about ground one, independent claims not including the reference to the standard. So the Board looked to the petition ground, which for claim one, referenced the testimony of Dr. Daba, who said that validation and certification would be required by U.K. regulatory authorities and for the product part of the claim, and then for the composition part of the claim referenced Module 5 of the PAR, which again talks about validation of manufacturing, and said, the petition said, this further confirms the validated sterility of the device and the solution. The Board looked to the disclosures of the PAR and looked to the testimony of Dr. Daba to conclude that, and Dr. Daba's testimony that using the term sterile in a regulatory approval document means something and means sterilized as construed here. So where the specific U.K. standard comes in was through the dependent claims, and the Board considered all of this evidence together. Again, for that specific U.K. standard, the Board credited the testimony of Dr. Daba. Let me ask the question a different way. Shouldn't the Board have included in the definition of a person of ordinary skill knowledge of foreign-based regulatory standards? And let me just go back to the discussion. Where are we being led to here as to what a person of ordinary skill and knowledge should know? There seems to be a leap here, and I want to know if that leap is substantiated. This goes back to the discussion you were having with counsel about the definition of personal skill in art, with which Sage's expert agreed. And in fact, the requirement that this person have four years of relevant experience was proposed by Sage's expert, and the Board adopted that. And the Board made the finding that someone with four years of experience in the relevant space would understand the regulations that would apply. But if that is something a person of ordinary skill in the art would know, shouldn't that be accounted for in the actual definition of who the person of ordinary skill in the art is? And if not, doesn't this create a hole in which the Board could potentially pour a lot of substance by simply saying, oh, it's something one of skill in the art would know? So I disagree with that characterization, Your Honor, because we have to think about how this debate about U.K. standard versus U.S. standard came into the proceeding. The Board made its finding about what a person of skill in the art would have known, and then Sage argued that the term sterile would have a questionable meaning based on what was happening in the U.S. There was evidence in the record that in the U.K. a different standard would apply, that in the U.K. sterilization was in fact required. And those are the arguments that the Board was responding to when it made its finding that knowledge of U.K. versus U.S. would be within – this would be within the knowledge of a person of skill in the art. And again, as to – And then based that definition on the U.S. research money of Dr. Daba, right? So the Board made the definition based on – it wasn't – Sage didn't propose a definition. The Board, in the institution decision, came up with a definition, and Sage's expert agreed with that. And then in the final written decision, the Board added Sage's expert's comment that four years of relevant experience would be required. Counsel, did Dr. Daba actually satisfy the definition of a person of ordinary skill in the art in this case? Yes, Your Honor. And so you can see the Board's findings regarding Dr. Daba specifically on Appendix 18. The Board properly found that Dr. Daba had four years of experience with sterilization processes for medical products, that he had familiarity with antiseptics, that he was involved in steam and ethanol oxide sterilization for several products, including medical devices, and credited his educational background and his familiarity with antiseptics. So again, this is the fact-finding that Sage is now disagreeing with, but the Board did consider Dr. Daba and credited him, his experience, and credited him as an expert whose testimony would be credited. On ground one, I believe Ms. Franson told us that the petition only sought invalidation based on anticipation under the proposed construction of the petition itself, and cut itself off from being able to, you know, try to prove anticipation under any other construction. Is that incorrect? I wouldn't agree with that, Your Honor, and that's because if you look to the petition, the arguments made at Appendix 6043 to 405, it references Dr. Daba's testimony who talks about validation and certification that was required. Again, at 6045 to 406, it references, you know, confirming the validated sterility of the device and the solution. So the petition did argue for the independent claims that the U.K. regulatory requirements applied. Yes, for the dependent claim, it talked about a specific standard, and that's because the dependent claims require a specific sterility level. So I don't believe that the petition cut itself off. And in fact, I agree with the question you were posing to Sage's counsel. The petition made an argument and then attempted to— and then a petitioner here attempted to prove anticipation under the board's construction, and the board— So what's your response to Sage's argument, potentially that the board's anticipation determination is based on documents that are not cited in the petition, at least in part? And one other thing, I don't know if you have your papers near the microphone, but if you could just back them up a little bit so I can hear you better when you respond. I'll try to speak up, Your Honor. Is that better? So remind me if there's a question, Your Honor, and I apologize. Sure, I wasn't trying to slow you down there. That's okay. So I think Sage's argument, at least in part, is that what's going on here is the board's anticipation determination is based on some documents that are never cited in the petition. I felt like when I was listening to Sage, it was arguing that there were basically some arguments that were being made effectively based on documents that weren't in the petition. So I think there—at least as to ground one, which I believe is what your question is about, there was—the board looked to Dr. Daba's testimony and the British Standard, and those were both—those were both cited, obviously, with the petition. There was testimony presented in the reply to counter Sage's specific argument that there's no way this standard could have applied. And again, the board's findings didn't depend entirely on those witness testimonies or those witness declarations that were presented with the reply. The board looked at all of the evidence, and crediting Dr. Daba, crediting the British Standard, concluded that compliance was required with the British Standard. And looking to Dr. Daba's, again, presented with the petition, concluded that the use of the term sterile in the strict regulatory context, such as the PAR, is a term with a precise meaning. I think Sage is also arguing that the board is somehow adopting arguments on behalf of the petitioner. What is your response to that? And I think that goes back to the point I was making earlier, Your Honor. It's not that the board is adopting arguments on behalf of the petitioner. There's 100 pages of analysis in the board's decision where the board goes through step-by-step every argument made by Sage in response to the petition and makes fact findings based on all of the evidence presented. So if you have a specific question about a specific finding, I'm happy to answer. I have a specific follow-up. How about these two declarations from the Becton employees and the emails that they're attaching to that? None of that, I think, is in the petition. What allows the board in an IPR on anticipation, which should be very narrowly focused, what allows the board to rely on that type of evidence to find anticipation in an IPR? So two points there, Your Honor. The way the declarations came into the proceedings was because Sage was contesting that the standard applied at all. And then second, the board did not base its decision on anticipation solely on that witness declaration testimony. It credited Dr. Daba and looked at the— Certainly not solely, but if it was error, and maybe you don't concede it was error, but if it was error to put any weight on that evidence which was not in the petition, wouldn't we have to remand at that point? No, Your Honor. If it was error, then it would be harmless error because, again, with just the Dr. Daba's testimony and the standard itself, there is substantial evidence for the board's findings here that a person with ordinary skill in the art would understand a term sterile as used in the par to mean sterilized as construed. And that's what we're looking at here. There's a lot of back and forth in the board's decision because it goes through and addresses each of Sage's arguments. But ultimately, the board's conclusion is that the term sterile would mean sterilized to a personal skill in the art. And it's part of the argument also that if we agree with the board's primary cleaning grounds, we wouldn't have to remand because we don't agree with the pictures of all grounds. That's correct, Your Honor. Because every single ground resolves each of the claims that are challenged. Could you talk for a second about the confidential nature, though, of that employee evidence? That would not be prior art, correct? What was just secretly known within Beckton Dickinson? That's correct, Your Honor. The declarations talked about which standards apply to the product, and some of that information was confidential. The declarations also talked about how Beckton was publicizing that there was difference between the UK and US product. Some of that may have been public. But again, the board's decision does not rest on those two declarations. The board credited Dr. Daba and the standard and the disclosures of the part itself and resolved all of the factual disputes in petitioner's favor here. Okay, anything else? Unless there are any further questions, Your Honor. Okay, we're fine. Thank you. Thank you, Your Honor. Ms. Forsen, you have three minutes of rebuttal. Thank you, Your Honor. Just a couple of quick points. One, I really want to make the point that it is not accurate. The petition did not argue in the independent claims, and I ask that you look at the Record Appendix 6043-46 that any standards were relevant to invalidity under Ground 1 in the independent claims. They just didn't argue it. They said the word sterile was enough to understand it, and that's sterilized. Right, but then you created a fact dispute, which they have a right to respond to, and the board has a right to make a finding out, correct? I don't believe we created a fact dispute. We said there was no anticipation because that claim construction didn't apply, so Ground 1, no anticipation. In Ground 2, there was an argument of obviousness based on the U.K. standards because they only alleged obviousness under our construction. So the board should have denied Ground 1 and moved to Ground 2 and addressed their obviousness argument under our construction. So I don't believe we created a fact dispute. We said there was no anticipation under the correct construction, move on to Ground 2. The other point I just want to make about the standards, the existence of standards that define whether a medical device is sterile or not, those standards exist in the U.K. with, for example, the 556 that they submitted, but they also exist in the U.S. There's standards, and they're in the record, 11-137, that say define what sterile is in the U.S. They're very similar. That doesn't mean, just because a standard exists, both in the U.S. and the U.K., that a person of ordinary skill and the art knows that a chlorhexidine has been sterilized according to that standard. And that's where I think the distinction and where the anticipation decision was clearly wrong, because what the board did was there was literally no evidence that a chlorhexidine product had been sterilized under a validated procedure in the PAR itself. And what the board did was it changed the definition of person of ordinary skill to have all this side knowledge to expand what was in the PAR. And the existence of a sterility definition in a standard, just like there was at the FDA here in the U.S., just like there was in the U.K., does not mean that it was actually sterilized. In fact, we presented evidence that in the U.S., despite the word sterile being used on chloroprep documents, a regulatory document, and having FDA regulations that say sterile, it wasn't sterilized. So BD's employees' personal knowledge about that is irrelevant. I also just want to quickly make a point that the colorant claims and the sterility assurance level claims, there was no evidence of the record of any sterilized colorant or any SAL of a product or article, not a solution, but a product or article comprising a solution in the PAR. Those were all items that the board made up as part of its grounds that it just invented on its own to fill in the gaps for the petitioner that it just got from knowledge in the ART. And the POSA definition isn't the place to backdoor all the information that's missing from the ART. So in conclusion, we request that the decisions be reversed. Thank you, Counselor. Thank you. We have your argument. We have the arguments of the party. We thank you for the arguments.